J-S46001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DESMOND SMITH :
:
Appellant : No. 983 EDA 2019

Appeal from the Judgment of Sentence Entered March 1, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010615-2016

BEFORE: BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED JANUARY 06, 2021**

Appellant, Desmond Smith, appeals from the March 1, 2019 judgment of sentence of 20 to 40 years' incarceration, imposed after he was convicted by a jury of rape (18 Pa.C.S. § 3121), involuntary deviate sexual intercourse ("IDSI") (18 Pa.C.S. § 3123), and sexual assault (18 Pa.C.S. § 3124.1). On appeal, Appellant challenges the court's denial of his pretrial motion to suppress, the court's rulings precluding him from presenting certain evidence, and the discretionary aspects of his sentence. After careful review, we vacate Appellant's judgment of sentence and remand for a new trial.

The trial court summarized the facts of Appellant's case, as follows:

On September 27, 2015, Kevin Brown, the father of complainant [E.M.,] was killed by masked men who came to his house in Montgomery County. [E.M.], who was a witness to the events, gave a statement to detectives on September 28, 2015. In the course of that statement[,] she identified Appellant as one of the masked men who came to her family's home and was involved in the killing of her father. She also provided information about the

August 22, 2015, sexual assault which was the subject of the charges in the instant trial.

On October 2, 2015, at 6:49 a.m., Montgomery County [H]omicide [D]etective George Henry arrested Appellant at his home in Philadelphia, pursuant to an arrest warrant. The arrest arose from the September 27, 2015 homicide. Appellant waived his right to go before a judicial authority in Philadelphia and agreed to go straight to Montgomery County. He was taken to the Montgomery County Detective Bureau where he was intermittently interviewed by Detective Henry over the course of about 11 hours, starting with waiver of his *Miranda*[1] rights at 8:42 a.m. and concluding around 7:51 p.m.

During the course of questioning, Appellant was asked about the murder o[n] September 27, 2015, and about the August 22, 2015, sexual assault of [E.M]. Appellant initially denied involvement in either the murder or the sexual assault. By the end of the questioning, he confessed to both the murder and the sexual assault.

Appellant and [his] co-defendant[,] Naadir Abdul-Ali[,] were tried in Montgomery County on the homicide. Appellant presented an alibi defense, including phone[-]tracking data and video evidence, and was acquitted. Abdul-Ali was convicted. On the day of the verdicts in the homicide case, [E.M.] posted on Facebook criticizing the alibi testimony and the acquittal, expressing her anger and insisting that Appellant was the person who killed her father and that he was wrongfully acquitted.

At trial in this case, the Commonwealth presented evidence that Abdul-Ali and [E.M.] were in a romantic relationship starting in the summer of 2015. During that time period she met Appellant through Abdul-Ali, and was in his company three or four times. On August 22, 2015, Abdul-Ali became angry with [E.M.]. While she was in the car with him[,] he became verbally and physically abusive.

They drove to a CVS parking lot, where Abdul-Ali continued to physically abuse and threaten [E.M.], including putting a gun to the back of her head and threatening to kill her. Abdul-Ali then ordered [E.M.] to perform oral sex on him in the car, during which

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he made a video call to Appellant and displayed [E.M.] performing oral sex.

Abdul-Ali then drove [E.M.] to Appellant's house to force her to have sex with Appellant, despite her pleading and refusals. Once they arrived, he took her into Appellant's bedroom. Abdul-Ali ordered [E.M.] to disrobe and perform oral sex on him and Appellant, then to have vaginal and anal intercourse with Appellant, during which she was forced to have vaginal intercourse with Abdul-Ali. During the course of the incident Abdul-Ali threatened [E.M.] with a gun and threatened or subjected her to physical force, including forcing the gun into her mouth.

Appellant gave a statement in which he admitted to having oral, attempted anal[,] and vaginal intercourse with [E.M.], asserting that she had been "acting like a victim[.]"

Trial Court Opinion (TCO), 11/6/19, at 2-4 (citations to the record omitted).

Prior to Appellant's trial for the rape of E.M., he filed a motion to suppress his admissions to police regarding his sexual acts with E.M. Specifically, Appellant averred that the *Miranda* warnings, provided at the start of his interrogation, did not establish that he voluntarily waived his right to counsel and to remain silent regarding E.M.'s sexual-assault allegations. He reasoned that the *Miranda* warnings, given in the morning, were too far removed from his inculpatory statements provided in the evening. Appellant also averred that the warnings were insufficient because they only informed him of his rights in connection to the homicide charges, and made no mention of E.M.'s sex-offense allegations. On December 20, 2017, a suppression hearing was conducted, at the close of which the court denied Appellant's motion to suppress his statements to police.

Also prior to trial, the Commonwealth filed a motion to preclude Appellant from admitting evidence that his inculpatory statements to police

were coerced and false. Specifically, Appellant wished to admit alibi evidence presented at his homicide trial — namely, surveillance video from SEPTA, and cell phone location data — to show that his confession to being at the scene of the murder was false. Appellant reasoned that the homicide alibi evidence would show "that if the homicide portion of the confession was patently unreliable, then the portions relating to the sexual assault [were] likewise questionable[,] since they were taken on the same day, during the same interrogation, by the same detectives." Appellant's Brief at 18. The trial court ultimately granted the Commonwealth's motion to preclude this evidence.

In a third, pre-trial evidentiary ruling, the court denied Appellant's request to be permitted "to present evidence, in the form of social media posts, that E.M. had a motive or bias to fabricate allegations against [Appellant] — or question E.M. regarding the same — at the trial in the matter *sub judice*." **Id.** The trial court denied Appellant's motion to admit this evidence.

Appellant and Abdul-Ali were tried together before a jury in December of 2018. At the close of trial, Appellant was convicted of the above-stated crimes. On March 1, 2019, the court sentenced him to two, consecutive terms of 10 to 20 years' incarceration for rape and IDSI. His offense of sexual assault merged for sentencing purposes. Thus, Appellant's aggregate sentence is 20 to 40 years' incarceration. Appellant filed a timely post-sentence motion, which the court denied. He thereafter filed a timely notice of appeal, and he also complied with the trial court's order to file a Pa.R.A.P.

1925(b) concise statement of errors complained of on appeal. The court filed a Rule 1925(a) opinion on November 6, 2019.

Herein, Appellant states four issues for our review, which we reorder for ease of disposition:

> [I.] Did the trial court err and/or abuse its discretion when it precluded evidence of a social media ([F]acebook) post made by complainant in which she exhibited extreme animosity toward [A]ppellant and dissatisfaction with his acquittal in a prior criminal case involving complainant, as that evidence is relevant to complainant's bias, motive to fabricate allegations against defendant, and credibility generally?

> [II.] Did the trial court err and/or abuse its discretion when it denied [A]ppellant's pre-trial motion to suppress a statement made to police investigators where: [A]ppellant waived his *Miranda* rights and provided a statement when police informed him that he was being charged with homicide; and, [A]ppellant was not re-advised of his *Miranda* rights, and did not waive those rights knowingly, intelligently, and voluntarily, when several hours later police began to question defendant about a separate sexual assault occurring on a different date than the homicide in a different jurisdiction?

> [III.] Did the trial court err and/or abuse its discretion when it precluded evidence that relates directly to the reliability (or lack thereof) of inculpatory statements made by [Appellant] during a police interrogation where the Commonwealth presented — and heavily relied upon — evidence of [Appellant's] inculpatory statements regarding the sexual assault at trial?

> [IV.] Is the sentence imposed unduly harsh and excessive?

Appellant's Brief at 6-7.

Appellant first challenges the trial court's ruling to preclude evidence of a Facebook post that E.M. made after Appellant was acquitted of the murder of her father. Initially, we observe that,

- 5 -

[t]he standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Young***, 989 A.2d 920, 924 (Pa. Super. 2010) (citations omitted).

In the Facebook post sought to be admitted by Appellant, E.M. made disparaging remarks about Appellant, and insisted that he was guilty of murdering her father, despite his acquittal for that crime. ***See*** TCO at 6 (quoting N.T. Trial, 12/18/18, at 15-16). Appellant wished to admit E.M.'s Facebook post to show that she had a motive to fabricate her sexual-assault allegations against him, in that she "sought to punish [Appellant] for her father's murder[,] notwithstanding the jury's verdict…." Appellant's Brief at 47. The trial court denied Appellant's motion to admit E.M.'s post. It provides the following rationale for its decision in its opinion:

The court concluded that the posting lacked relevance and might lead to jury confusion. Since [E.M.] reported the rape before Appellant was acquitted of her father's murder, Appellant's argument that the post was necessary to show bias or motive to fabricate is unpersuasive. Thus, her expressive disagreement with the verdict or possible factual determinations in that case offered no probative value to the instant trial. Accordingly, the court properly excluded the posting as not relevant.

Assuming, *arguendo*, that evidence of the post had any probative value, it would be far outweighed by the risk of this trial being subsumed by the alleged events of Appellant's murder trial.

Appellant sought to import factual issues and assertions that pertained only to the murder case, and hopefully to also influence the jury to adopt its outcome. By contrast, the court sought to have this case tried on its own merits, and [to] prevent it from becoming a retrial of the homicide case. No curative instructions would have been sufficient to safeguard this case from undue jury confusion and prejudice.[3] Accordingly, the court properly concluded that the contents of the posting were far more prejudicial than probative.

    [3] The expletives used in that post, while irrelevant, would have served only to inflame the jury.

For whatever reason, the defense elected not to ask [E.M.] about her feelings regarding the acquittal, an area of inquiry which the court did permit, and to which the Commonwealth had agreed. N.T.[,] 12/18/18, [at] 19-20. Such exploration would have accomplished Appellant's goal of eliciting that testimony, without introducing the details of the post or the homicide trial. Of course, if the complainant's responses to such questioning contradicted her prior expressions in the post, then the court could and would have reconsidered its ruling on impeachment grounds.

TCO at 6-7.

Based on the rationale set forth by the trial court, we discern no abuse of discretion in its pre-trial ruling to preclude E.M.'s Facebook post. Therefore, Appellant's first issue is meritless.

Next, Appellant challenges the court's pre-trial ruling denying his motion to suppress the inculpatory statements he made to police during his interrogation on November 2, 2015. Appellant insists that his statements were involuntary because he was arrested and provided with *Miranda* warnings pertaining only to the murder of E.M.'s father. At no point did the interrogating detectives advise Appellant that his statements could be used against him in prosecuting the sexual assault crimes, yet the detectives questioned him about those offenses. Appellant also argues that the *Miranda*

warnings, provided at 8:25 a.m., were too far removed from his confession regarding the sexual assault of E.M., provided at or after 5:40 p.m., to establish that his statement was voluntarily, intelligently, and knowingly given.

We begin by recognizing:

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (cleaned up).

In addition, our Court has explained:

A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession. The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his *Miranda* rights.

- 8 -

When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Commonwealth v. Harrell*, 65 A.3d 420, 433–34 (Pa. Super. 2013) (cleaned up).

Here, at the suppression hearing, the Commonwealth presented the testimony of Detective Henry. N.T. Hearing, 12/20/17, at 4. He testified that on November 2, 2015, he executed a warrant for Appellant's arrest for the homicide of E.M.'s father. *Id.* at 5. Appellant was taken into custody at his home in Philadelphia at 6:49 a.m., and was advised that he was being arrested for the homicide. *Id.* at 5, 8. Appellant was then transported to the Montgomery County Detective Bureau. *Id.* at 6. Once there, he was given *Miranda* warnings at approximately 8:25 a.m. *Id.* at 9. The *Miranda* warnings were set forth on a written form, which stated that Appellant was being investigated for homicide. *Id.* at 7. He was at no point notified, on the written form or verbally by Detective Henry, that he was also suspected of sexually assaulting of E.M. *Id.* Appellant signed the waiver form. *Id.* at 11.

Between 9:27 a.m. and 10:56 a.m., Detective Henry recorded a formal statement by Appellant. *Id.* at 12. Appellant was asked various questions, including whether he ever had sex with E.M. *Id.* He denied that he did. *Id.*

at 15.[2]  Detective Henry then paused Appellant's statement from 10:56 a.m. to 2:56 p.m.  **Id.**  During the four-hour break, however, Detective Henry continued to question Appellant "off-the-record" about various topics, including the sexual assault of E.M.  **Id.** at 17.  Appellant's statement resumed at 2:56 p.m., and he was questioned exclusively about E.M.'s assault allegations until approximately 3:05 p.m.  **Id.** at 20.  During that questioning, Appellant admitted to having oral sex with E.M.  **See** N.T. Trial, 12/19/18, at 153.[3]  He also admitted that he heard Abdul-Ali tell E.M. not to tell anyone.  **Id.** at 154.

At that point, another detective, disguised as a DNA lab analyst, entered the interrogation room and falsely told Appellant that his DNA had been found at the homicide scene.  N.T. Hearing at 20.  Detective Henry then paused Appellant's statement from 3:35 p.m. until 5:39 p.m.  **Id.** at 23.  During that break, Appellant was again questioned "off the record" about various topics,

---

[2] Detective Henry testified that he questioned Appellant about the sex offenses against E.M. to establish Appellant's "relationship with the co-defendant and also if he knew the [homicide] victim or the victim's daughter[, E.M.]"  **Id.** at 22.

[3] We recognize that in **In re L.J.**, 79 A.3d 1073, 1087 (Pa. 2013), our Supreme Court held that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.  Here, Appellant's full statement was admitted into evidence at the suppression hearing.  **See** N.T. Hearing at 31.  However, it was not read into the record during Detective Henry's testimony in that proceeding, as it was during the detective's trial testimony.  Because Appellant's statement is not contained in the certified record before us on appeal, we refer to Detective Henry's trial testimony to discern the contents of Appellant's statement to police.  This does not violate the rule announced in **In re L.J.**, as the trial court had Appellant's full statement before it when ruling on his suppression motion.

including the sexual assault of E.M. *Id.* at 23, 25. When the formal statement resumed at 5:39 p.m., the first questions asked by Detective Henry were about the sexual offenses alleged by E.M. *Id.* at 25. Appellant at some point thereafter admitted that he had vaginal intercourse with E.M., and that he had attempted to have anal intercourse with her, as well. N.T. Trial, 12/19/18, at 158.

At the close of the suppression hearing, the trial court denied Appellant's motion to suppress his statements about the sexual offenses committed against E.M. Notably, however, the court offered no factual findings, nor any clear legal determinations. Instead, the court stated only the following:

> THE COURT: I'll be as specific as I can. I'll deny the motion to suppress in that ***Miranda*** … has taken us so many directions. I know what I'm looking for as far as [Appellant's] not being advised what he's questioned about. I understand [what] that means. I guess it's a pointed issue. When he starts saying someone is given a statement [and] that they have weighed their rights and want to speak and take the train down the track. I'm not ready to find those facts here, … and I deny the motion at this time.

*Id.* at 37.[4]

Appellant now contends that the trial court's ruling to admit his inculpatory statements was error. He insists that his statements regarding the sex offenses committed against E.M. were involuntary because the

---

[4] The judge who presided over the suppression hearing later left the bench and a different judge presided over the subsequent pre-trial motions and Appellant's trial. Thus, in the court's Rule 1925(a) opinion, it offers no discussion of this issue, simply referring this Court to the portion of the record containing the above-quoted ruling by the suppression judge. ***See*** TCO at 4 n.2.

*Miranda* warnings provided by Detective Henry made no mention of those offenses and pertained solely to the homicide crime. Additionally, he claims that the warnings were stale and too far removed from his inculpatory statements to support their voluntariness. In support of his arguments, Appellant relies primarily on two cases, ***Commonwealth v. Riggins***, 304 A.2d 473 (Pa. 1973), and ***Commonwealth v. Wideman***, 334 A.2d 594 (Pa. 1975). In ***Riggins***, our Supreme Court explained:

> There is no prophylactic rule that a suspect must be re[-]warned of his constitutional rights each time custodial interrogation is reviewed. Instead, we must view the totality of circumstances in each case to determine whether such repeated warnings are necessary.
>
> Pertinent to such an inquiry are the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.

***Riggins***, 304 A.2d at 477-78 (quoting ***Commonwealth v. Bennett***, 282 A.2d 276, 280 (Pa. 1971)).

The ***Riggins*** Court ultimately held that the police in that case had been required to re-advise Riggins of his ***Miranda*** rights, based on the following circumstances:

> Seventeen hours elapsed between [Riggins'] initial ***Miranda*** advisement and his oral confession; the warnings were given in the police car, while the interrogation was conducted at the Police Administration Building in downtown Philadelphia; the officers who gave the warnings had no further contact with [Riggins] once he arrived at the Administration Building and the questioning began…[; and] the oral confession was obviously 'materially

different' from the denials [Riggins] had given, regarding the robbery and murder, for the 17 hours preceding its elicitation.

*Id.* at 478.

Analyzing the **Bennett** factors several years later in **Wideman**, the Court again concluded that officers should have re-advised Wideman of his constitutional rights. There, twelve hours had elapsed between the **Miranda** warnings and Wideman's confession; the warnings and confession occurred in different rooms of the Police Administration Building; the officers that provided Wideman's **Miranda** warnings were not present when he confessed; there was a material difference between the statements that Wideman made in the morning after the **Miranda** warnings were provided and his confession provided that evening; and the continuity of the interrogation was broken on several occasions, including when Wideman was permitted to sleep for 3½ hours. **Wideman**, 334 A.2d at 599. Accordingly, the **Wideman** Court held that Wideman "should have been re[-]advised of his **Miranda** rights prior to the interrogation session during which the complained of statement was elicited." **Id.** Because he was not, his confession was inadmissible. **Id.**

Here, we again stress that the suppression court made no factual findings or legal determinations regarding the **Bennett** factors, despite that Appellant argued that those considerations warranted the suppression of his statements to police. **See** Motion to Suppress, 6/28/17, at 3; N.T. Hearing at 32-34. Indeed, the court offered no coherent reason for its decision to deny Appellant's suppression motion. After carefully reviewing the record and pertinent case law, we must conclude that the court erred.

- 13 -

Initially, from Detective Henry's testimony, it is clear that two of the **Bennett** factors weigh in favor of a conclusion that Appellant did not need to be re-**Mirandized** prior to his inculpatory statements: Appellant was provided **Miranda** warnings and interrogated in the same room, and Detective Henry both advised Appellant of his rights and ultimately recorded Appellant's at-issue statements.  However, other circumstances in this case lead us to conclude that Appellant should have been re-informed of his constitutional rights.

First, just over six hours had passed between Appellant's **Miranda** warnings and his first inculpatory statements, made at or after 2:56 p.m. Over nine hours had elapsed between the warnings and his admissions made at or after 5:39 p.m.  While not as long as the spans of time in **Riggins** or **Wideman**, the time between the warnings and admissions in this case is nonetheless significant, and longer than other cases where our Supreme Court has held that re-warning was unnecessary.  *See Commonwealth v. Jones*, 386 A.2d 495, 498 (Pa. 1978) (finding warnings were not stale when an incriminating statement was given three hours after warnings, warnings were given in the same room, and the same warning officers conducted the interview); **Commonwealth v. Gray**, 374 A.2d 1285, 1289 (Pa. 1977) (holding that warnings were not stale when given a little over two hours before the incriminating statement, warnings were given in the same room, and a statement made just after the warnings did not materially differ from the latter statement sought to be suppressed); **Bennett**, 282 A.2d at 280 (deeming

- 14 -

warnings not stale where they were given just under five hours before the interrogation, the defendant was only moved a distance of a few miles, and, while the statement was given to an officer other than the warning officer, it was substantially similar to the defendant's earlier statement just after the warnings were given).

Second, while Appellant initially denied any sexual contact with E.M. when the interrogation began, he offered a materially different statement six hours later when he admitted to having oral intercourse with E.M. Then, nine hours after his initial denial of sex with E.M., he confessed to having vaginal and attempted anal sex with her.

Third, there are other circumstances in this case that convince us that the continuity of Appellant's interrogation was broken and new *Miranda* warnings were required. *See Commonwealth v. Scott*, 752 A.2d 871, 875 (Pa. 2000) (stating that the *Bennett* factors, "though not mandatory, guide us in determining whether there has been a 'clear continuity of interrogation'") (citation omitted). For instance, there were lengthy breaks during the taking of Appellant's written statement, during which he was questioned 'off-the-record' about 'various topics,' including the sexual assault of E.M. and her father's murder. In addition, Appellant's formal statement was interrupted when an officer, dressed as a lab technician, entered the interrogation room to falsely inform Appellant that his DNA had been located at the scene of E.M.'s father's murder. These breaks in the taking of Appellant's formal statement

support that there was no continuity in the interrogation regarding E.M.'s sexual assault allegations.

Another factor supporting a conclusion that Appellant should have been re-***Mirandized*** is the fact that the ***Miranda*** warnings he was provided pertained only to the homicide. Detective Henry admitted that Appellant was never informed he was a suspect in the sexual assault of E.M., or advised of his constitutional rights as they pertained to those crimes. Nevertheless, Appellant was specifically questioned about his sexual conduct with E.M. during his formal statement.

We disagree with the Commonwealth's position that the homicide and sexual assault of E.M. were sufficiently similar so as to notify Appellant that he would likely be questioned about both. This Court has declared that:

> The Pennsylvania courts, in interpreting ***Miranda***, have held that, in order for an accused to exercise his ***Miranda*** rights intelligently, ***he must have knowledge of the particular transaction under investigation***. This does not mean that the accused need know the technicalities of the offense or every conceivable consequence which might flow from a ***Miranda*** waiver, but he does have a right to know of the general nature of the incident giving rise to the investigation.

***Commonwealth v. Brown***, 491 A.2d 189, 190–91 (Pa. Super. 1985) (emphasis added). Here, aside from being serious, violent offenses, the sexual assault crimes committed against E.M. are not of the same general nature as the homicide of her father. Moreover, the crimes occurred weeks apart and in different counties. Specifically, the sexual offenses committed against E.M. took place in August at Appellant's home in Philadelphia, while

the homicide occurred five weeks later in Montgomery County at E.M.'s father's home. Based on these differences, we conclude that Appellant's being ***Mirandized*** regarding the homicide crime was not sufficient to notify him of his rights regarding the sex offenses committed against E.M.

In sum, based on the totality of the circumstances surrounding Appellant's interrogation, we conclude that the ***Miranda*** warnings provided to him were not sufficient to demonstrate the voluntariness of his inculpatory statements regarding the sexual assault of E.M. Appellant was not informed that he was being investigated for those crimes, or notified of his constitutional rights regarding them. Six and nine hours elapsed between the warnings being provided and his inculpatory statements. Over the course of those hours, there were lengthy breaks in the taking of Appellant's statement, during which the questioning went back and forth between the homicide and the sexual assault allegations. Appellant's statements materially changed from his initially denying any sexual contact with E.M., to his admitting that he had oral sex with her, to his finally claiming that he had vaginal and attempted anal intercourse with her. Given the totality of these circumstances, we cannot conclude that Appellant knowingly and intelligently waived his constitutional rights and provided voluntary statements to police regarding the sexual assault of E.M. Therefore, the trial court erred by denying Appellant's motion to suppress, and a new trial without the admission of his inculpatory statements is required.

In Appellant's next issue, he contends that the trial court erred in granting the Commonwealth's pretrial motion to preclude him from presenting the alibi evidence from his homicide trial, *i.e.,* the SEPTA surveillance video and cell location data. According to Appellant, this evidence "indicated that his confession to being at the scene of the murder was false, unreliable, and coerced" and would therefore cast doubt on the reliability of his inculpatory statements regarding the sexual assault of E.M. Appellant's Brief at 41. The trial court granted the Commonwealth's motion to preclude this alibi evidence for the homicide, explaining that it was not necessary because "the jury had … been informed that Appellant was acquitted of the murder after presenting alibi evidence." TCO at 8 (citing N.T. Trial, 12/19/18, at 160-61, 207).

We need not determine whether the court's evidentiary ruling was erroneous, as we are granting Appellant a new trial at which his inculpatory statements will not be admitted. Therefore, he will not need to admit the at-issue alibi evidence for the purpose of challenging the veracity of his now-suppressed statements to police.[5]

Finally, Appellant challenges the discretionary aspects of the sentence imposed by the court. Because we are affording Appellant a new trial, his judgment of sentence is hereby vacated. Therefore, we need not address the merits of his sentencing challenge.

---

[5] We express no opinion on the admissibility of that evidence for any other purpose.

Judgement of sentence vacated. Case remanded for a new trial consistent with this memorandum. Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 1/6/2021*